SHAW, Judge.
Charlie Washington was indicted for five counts of capital murder in connection with the murders of Julian McKinnon and his wife Florence McKinnon. Count I of the indictment charged Washington with the murders of Mr. and Mrs. McKinnon by one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala.Code 1975; count II of the indictment charged Washington with the murder of Mr. McKinnon during the course of a robbery, see § 13A-5-40(a)(2), Ala.Code 1975; count III of the indictment charged Washington with the murder of Mrs. McKinnon during the course of a robbery, see § 13A-5-40(a)(2), Ala.Code 1975; count IV of the indictment charged Washington with the *154 murder of Mr. McKinnon during the course of a burglary, see § 13A-5-40(a)(4), Ala.Code 1975; and count V of the indictment charged Washington with the murder of Mrs. McKinnon during the course of a burglary, see § 13A-5-40(a)(4), Ala.Code 1975. The jury found Washington guilty of all five counts of capital murder and, by a vote of 10-2, recommended that Washington be sentenced to death. The trial court accepted the jury’s recommendation and sentenced Washington to death for his capital-murder convictions.
The evidence adduced at trial indicated the following. Washington worked for the McKinnons as a handyman, helping the McKinnons maintain their home and property in Millbrook. On Monday, January 20, 2003, Washington drove Mr. McKinnon to Clio in Mr. McKinnon’s Chevrolet Suburban sport-utility vehicle, where Mr. McKinnon sold a piece of land he owned in Clio to Joe Carpenter. Outside the presence of Washington, Carpenter gave Mr. McKinnon $10,000 in cash, wrapped in a thousand-dollar money wrapper, as partial payment for the land; the cash was predominately in $100 bills, but also contained $10 and $20 bills. Mr. McKinnon put the money in his coat pocket and, pursuant to a prearranged agreement between Carpenter and Mr. McKinnon, when the two returned to Washington’s presence, Carpenter told Mr. McKinnon that he would mail Mr. McKinnon a check for the land. Before leaving Clio, Mr. McKinnon and Washington stopped at a tractor repair shop, where Mr. McKinnon purchased a leveling arm. Mr. McKinnon paid for the leveling arm with a $100 bill he took from his wallet.
Mr. McKinnon and Washington returned to the McKinnons’ residence in Millbrook that afternoon at approximately 4:00 p.m., where Mrs. McKinnon was entertaining guests. Because guests were there, instead of driving Washington, who did not have a car at that time, to his home in Montgomery, Mr. McKinnon allowed Washington to borrow his Volkswagen Jetta automobile to drive home.[1] That evening, at approximately 8:00 p.m., Ernestine Howard, Washington’s live-in girlfriend, telephoned the McKinnons looking for Washington, who had not yet returned home. Mr. McKinnon informed Howard that he had lent his car to Washington and that Washington had left the McKinnons’ residence at approximately 5:00 p.m. Later that evening, at approximately 10:00 p.m., Mr. McKinnon telephoned Howard and asked if Washington had made it home yet; he had not.
• At approximately 9:00 a.m. the next morning, Tuesday, January 21, 2003, Howard telephoned the McKinnons; she received a busy signal. Joe Carpenter also attempted to telephone Mr. McKinnon several times on Tuesday, January 21, but received a busy signal each time. The McKinnons’ daughter also received a busy signal on January 21 when she tried to reach her parents. On the morning of Wednesday, January 22, 2003, Carpenter drove from Clio to Millbrook to meet with Mr. McKinnon to complete the sale of the land. On the drive, Carpenter telephoned Mr. McKinnon several times from his cellular telephone and again received a busy signal. When Carpenter arrived at the McKinnons’ residence in Millbrook, he knocked on the door, but no one came to the door. While Carpenter was at the McKinnons’ residence, Howard arrived looking for Washington, whom she had not seen since Monday morning, January 20, when she had driven him to the McKin-nons’ residence for work. Howard also knocked on the McKinnons’ door, but no *155 one came to the door. Carpenter then telephoned the McKinnons’ daughter, who told Carpenter where the spare key to the house was located and asked Carpenter to check on her parents. Upon entering the home Carpenter discovered Mrs. McKin-non’s body; he immediately left the home and telephoned emergency 911.
Law-enforcement officers from the Mill-brook Police Department and the Alabama Bureau of Investigation (“the ABI”) responded to the report. Mrs. McKinnon’s body was found at the base of the staircase leading to the second floor of the house; she appeared to have suffered blunt-force trauma. There were bloodstains and splattered blood on the staircase and several gouges in the stairs at the top of the staircase, indicating that Mrs. McKinnon had been attacked at the top of the stairs, and that the attacker, while striking Mrs. McKinnon, missed her and hit the stairs. Mr. McKinnon’s body was discovered in the master bedroom on the second floor; he also appeared to have suffered blunt-force trauma. Several coins — mainly foreign coins, but also some United States half-dollar coins — were found near his body. The telephone in the master bedroom was on the floor, off the hook, and a thousand-dollar money wrapper was found in the master bathroom. The house had been ransacked, and a window in the kitchen area was broken and open. The shattered glass from the window was inside the house, indicating that the window had been broken from the outside; the broken pane of glass was the pane directly above the latch, indicating that the perpetrator had broken the glass and reached in to unlatch and then open the window in order to gain entry into the residence. An autopsy revealed that Mr. and Mrs. McKinnon had both died from blunt-force trauma to the head, which had resulted in skull fractures and brain damage. In addition, Mrs. McKinnon suffered blunt-force trauma to her back, which broke every one of her ribs. The medical examiner testified that the murder weapon was most likely a hard, dense object or tool.
During the initial investigation at the scene, law-enforcement officers spoke with both Carpenter and Howard. They learned that Washington had been employed by the McKinnons; that Washington had traveled with Mr. McKinnon to Clio on Monday, January 20; that Mr. McKinnon had received $10,000 in cash at that time for the sale of land; that the McKinnons’ Jetta was missing from the house and had been loaned to Washington sometime earlier in the week; and that Howard had not seen Washington in two days. The $10,000 was not found in the house or anywhere on the McKinnons’ property, and law enforcement issued a BOLO — be on the lookout — for the Jetta. That afternoon, patrol officers with the Montgomery Police Department saw the Jetta in the parking lot of John’s Motel on Air Base Boulevard in Montgomery. When the officers learned that Washington had rented a room at the motel, they knocked on the door and arrested Washington when he opened the door. During a subsequent search of the motel room, law-enforcement personnel discovered $1,700 in cash, mostly in $100 bills, crack cocaine, a black baseball-style cap, and various articles of clothing. In the Jetta, they found an additional $6,300 in cash, all in $100 bills, as well as several United States half-dollar coins and one foreign coin.
Washington was taken to ABI headquarters where he was interviewed. In his statement, Washington stated that Mr. McKinnon had loaned him the Jetta; that he had driven a friend to Atlanta on the night of Monday, January 20, to purchase drugs; that, on the way, they stopped at a truck stop at the Wire Road exit on Inter *156 state 85; that he had “had words” with a waitress at the truck stop regarding his order (C. 289); and that his friend had given him $2,500 in cash for making the trip. Washington did not provide the name of the friend he had allegedly driven to Atlanta. After Washington gave his statement, law-enforcement personnel obtained a search warrant for the clothes Washington was wearing as well as fingernail clippings from Washington. Subsequently, on February 6, 2003, law-enforcement personnel obtained a seizure order for samples of Washington’s hair and saliva.
The State presented evidence indicating that Washington’s statement to law enforcement was, in large part, false. The State presented testimony from the waitress who was working at the truck stop at the Wire Road exit on Interstate 85 on the night of January 20. She testified that she had never seen Washington before; that Washington was not at the truck stop on the night of January 20; and that she had not had an argument with any customer regarding an order that night. The State presented testimony indicating that on the night of January 20 Washington visited what is called the “Big House” in Montgomery, a house known for prostitution and drugs. Testimony indicated that Washington arrived at the “Big House” at approximately 8:00 p.m. and asked for a prostitute; that Washington left the house for a while later in the evening, asking the security guard at the house to watch his car; that when Washington returned, he gave the security guard a $100 bill for watching the car; that Washington spent several hundred dollars on crack cocaine that evening and the next day; that Washington told various people that he had money alternatively because he had received an income-tax refund and because he had received a payroll check; that on the night of Tuesday, January 21, 2003, Washington left the “Big House” with a prostitute and went to John’s Motel on Air Base Boulevard; and that the next morning, on Wednesday, January 22, 2003, the prostitute, with money given to her by Washington, bought Washington new clothing, including a pair of jeans and a shirt.
The State also presented testimony indicating that on the night of January 20, Washington went to the residence of William Flurry, for whom Washington had been working, and asked for $65, saying that he needed the money to get his truck out of the repair shop. Flurry testified that Washington was wearing a dark-colored baseball-style cap at the time. Stephanie Dawn Childree, who lived near the McKinnons in Millbrook, testified that she saw a black male, between 50 and 60 years of age,[2] near the McKinnons’ residence between 10:30 p.m. and 11:00 p.m. on the night of January 20, 2003. The man was wearing a plaid shirt and a dark hat, and he was driving a light blue truck with a cracked front windshield. Law-enforcement personnel were unable to locate the truck.
The State presented evidence indicating that a hair found clenched in Mr. McKin-non’s left hand was the same size, color, and shape of Washington’s hair; that a smear of blood on the doorframe between the dining room and the laundry room in the McKinnons’ residence contained Washington’s DNA; that a bloodstain on the shirt Washington was wearing when he gave his statement contained both Mr. McKinnon and Mrs. McKinnon’s DNA, as well as Washington’s DNA; and that a bloodstain on one of Washington’s socks found in the motel room contained Mr. *157 McKinnon's DNA. The McKinnons’ DNA was not found on the jeans Washington was wearing when he gave his statement and no DNA at all was found on the boots Washington was wearing. No fingerprints were found in the McKinnons’ residence and no blood was found in the Jetta. The murder weapon was never recovered.
Because the death penalty was imposed in this case, this Court is required to review the record for plain error. Rule 45A, Ala.R.App.P., provides:
’ “In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
“Plain error” has been defined as error “ ‘so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.’ ” Ex parte Womack, 435 So.2d 766, 769 (Ala.1983), quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981). “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000). This Court has recognized that “ ‘[t]he plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” ’ ” Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).
I.
Washington first contends that the trial court erred in denying his motions to suppress all evidence linking him to the murders that was obtained after his arrest. Specifically, Washington argues that the following should have been suppressed: (1) the currency, crack cocaine, cap, and sock found in his motel room, as well as all results from DNA testing performed on the sock; (2) the currency and coins found in the Jetta; (3) the statement he made to law enforcement; (4) the shirt he was wearing when he gave his statement, which was obtained pursuant to the search warrant, and all results from DNA testing performed on the shirt; (5) the hair sample obtained pursuant to the seizure order and all results from testing on the hair; and (6) all results from DNA testing on the saliva sample obtained pursuant to the seizure order.[3]
“The trial court held the suppression hearing outside the hearing of the jury; therefore, we review the evidentiary findings of the trial court at that hearing under the ore tenus standard.” Ex parte Jackson, 886 So.2d 155, 159 (Ala.2004). “When evidence is presented ore tenus to the trial court, the court’s findings of fact based on that evidence are presumed to be correct,” Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994); “[w]e indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,” Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App.1985), aff'd, 494 So.2d 772 (Ala.1986); and we make “‘all the reasonable inferences and credibility choices supportive of the decision of the *158 trial court.’ ” Kennedy v. State, 640 So.2d 22, 26 (Ala.Crim.App.1993), quoting Bradley, 494 So.2d at 761. “ ‘ “Where evidence is presented to the trial court ore tenus in a nonjury case, a presumption of correctness exists as to the court’s conclusions on issues of fact; its determination will not be disturbed unless clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.” ’ ” Ex parte Jackson, 886 So.2d at 159, quoting State v. Hill, 690 So.2d 1201, 1203 (Ala.1996), quoting in turn Ex parte Agee, 669 So.2d 102, 104 (Ala.1995).
However, “[t]he ore tenus presumption of correctness applies to findings of fact, not to conclusions of law.” City of Russellville Zoning Bd. of Adjustment v. Vernon, 842 So.2d 627, 629 (Ala.2002). “[T]he ore tenus rule does not extend to cloak a trial judge’s conclusions of law, or incorrect application of law to the facts, with a presumption of correctness.” Eubanks v. Hale, 752 So.2d 1113, 1144-45 (Ala.1999). “ ‘ “[WJhen the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court’s judgment.” ’ ” Ex parte Jackson, 886 So.2d at 159, quoting Hill, 690 So.2d at 1203, quoting in turn, Ex parte Agee, 669 So.2d at 104. Thus, we review the trial court’s conclusions of law and its application of law to the facts under the de novo standard of review.
A.
First, Washington contends that his statement to law enforcement and all evidence obtained after his arrest should have been suppressed because, he says, his arrest was unlawful. Specifically, Washington argues that he was arrested without a warrant in a motel room in which he had a legitimate expectation of privacy and that law-enforcement officers had no probable cause to arrest him and no exigent circumstances for doing so in the motel room. Thus, Washington concludes, his statement and all evidence obtained after the arrest were “fruit of the poisonous tree.”
Initially, we note that the State presented no evidence at the suppression hearing or at trial regarding the circumstances surrounding Washington’s arrest; the State did not call to testify any of the Montgomery police officers who arrested Washington. The only testimony regarding the circumstances of the arrest was from Washington himself, who testified at the suppression hearing.[4] Specifically, Washington testified that he had rented a room at John’s Motel; that at some point during the day on January 22, 2003, he heard a knock at the door; that when he opened the door, several police officers, with guns drawn, entered the motel room and ordered him to lie on the floor; that the officers then handcuffed him, escorted him from the motel room, and placed him in a patrol vehicle; and that he was wearing only his underwear at the time. On appeal, the State does not dispute Washington’s testimony. To the contrary, the State concedes that Washington was arrested without a warrant; that the arrest occurred in Washington’s motel room; and that, under the Fourth Amendment, Washington had a legitimate expectation of privacy in his motel room. For purposes of this appeal, then, we accept these facts as true.
It is well settled that a warrant-less and nonconsensual entry into a suspect’s home for the purpose of effectuating a felony arrest is presumptively unreasonable and prohibited by the Fourth Amendment unless the State proves both probable cause and exigent circumstances. See, *159 e.g., Kirk v. Louisiana, 536 U.S. 635, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002); Minnesota v. Olson, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); Welsh v. Wisconsin, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); and Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Based on the record before us, we conclude that the State proved that both probable cause and exigent circumstances were present and, thus, that Washington’s arrest was lawful.
“ ‘Section 15-10-3[ (a)](3), Ala.Code 1975, provides that an officer may arrest an individual without a warrant when a felony has been committed and he has reasonable cause to believe that the individual arrested committed the felony.’ Sockwell v. State, 675 So.2d 4, 13 (Ala.Crim.App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996). ‘[R]easonable cause has been equated with probable cause.’ Daniels v. State, 534 So.2d 628, 651 (Ala.Crim.App.1985), aff'd, 534 So.2d 656 (Ala.1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987), opinion after remand, 534 So.2d 658 (Ala.Crim.App.1987), aff'd, 534 So.2d 664 (Ala.1988), cert. denied, 488 U.S. 1051, 109 S.Ct. 884, 102 L.Ed.2d 1007 (1989). “‘The rule of reasonable or probable cause is a ‘practical, nontechnical conception,’ ” ’ id., quoting Tice v. State, 386 So.2d 1180, 1183 (Ala.Crim.App.), cert. denied, 386 So.2d 1187 (Ala.1980), and ‘[t]he level of evidence needed for a finding of probable cause is low.’ State v. Johnson, 682 So.2d 385, 387 (Ala.1996). ‘ “ ‘Probable cause exists where “the facts and circumstances within [the arresting officers’] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that” an offense has been or is being committed.’ ” ’ State v. Johnson, 682 So.2d at 388, quoting Young v. State, 372 So.2d 409, 410 (Ala.Crim.App.1979), quoting, in turn, Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959). Put another way, ‘[p]robable cause is knowledge of circumstances that would lead a reasonable person of ordinary caution, acting impartially, to believe that the person arrested is guilty.’ Sockwell, 675 So.2d at 13. ‘ “An officer need not have enough evidence or information to support a conviction [in order to have probable cause for arrest].... ‘Only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.’ ” ’ State v. Johnson, 682 So.2d at 387-88, quoting Stone v. State, 501 So.2d 562, 565 (Ala.Crim.App.1986), overruled on other grounds, Ex parte Boyd, 542 So.2d 1276 (Ala.), cert. denied, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989).
“ ‘ “In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act....” Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1891 (1949). “ ‘The substance of all the definitions of probable cause is a reasonable ground for belief of guilt.’ ” Id. “Probable cause to arrest is measured against an objective standard and, if the standard is met, it is unnecessary that the officer subjectively believe that he has a basis for the arrest.” Cox v. State, 489 So.2d 612 (Ala.Cr.App.1985).’
“Dixon v. State, 588 So.2d 903, 906 (Ala.1991). See also Minor v. State, 780 So.2d 707, 733 (Ala.Crim.App.1999), *160 rev’d on other grounds, 780 So.2d 796 (Ala.2000); and McWhorter v. State, 781 So.2d 257, 288 (Ala.Crim.App.1999), aff'd, 781 So.2d 330 (Ala.2000). Tn making the determination as to whether probable cause exists for a warrantless arrest, we must examine the totality of the circumstances surrounding the arrest.’ Sockwell, 675 So.2d at 13, quoting Daniels, 534 So.2d at 651.”
Reeves v. State, 807 So.2d 18, 35-36 (Ala.Crim.App.2000).
Here, the knowledge accumulated by the ABI investigators during their initial investigation at the murder scene established probable cause to arrest Washington.[5] At the suppression hearing, the State presented testimony indicating that, at the time of his arrest at approximately 3:00 p.m. on the afternoon of Wednesday, January 22, ABI investigators knew that Washington had been employed by the McKinnons; that Washington had traveled with Mr. McKinnon to Clio on Monday January 20; that Mr. McKinnon had received $10,000 in cash at that time for the sale of land to Joe Carpenter;[6] that the $10,000 was missing from the house; that the McKinnons’ Jetta was missing from the house and had been loaned to Washington sometime earlier in the week;[7] that Washington had not returned home after he finished work for the McKinnons on Monday, January 20, and had been missing for two days; and that the McKinnons had most likely been murdered in the late evening hours of Monday, January 20 or the early morning hours of Tuesday, January 21. These facts were sufficient to “lead a reasonable person of ordinary caution, acting impartially, to believe” that Washington had been involved in the McKinnons’ murders. Thus, there was probable cause to arrest Washington.
*161 Moreover, we reject Washington’s argument that because different law-enforcement officers had different subjective beliefs as to the reason for Washington’s arrest — one officer testified that he believed Washington had been arrested for theft of the McKinnons’ Jetta; another testified that he believed Washington had been arrested for possession of a controlled substance — there could be no probable cause to arrest Washington for the murders.
“ ‘[B]ecause the test for determining probable cause is an objective and not a subjective test, this court may “ ‘find probable cause in spite of an officer’s judgment that none exists.’ ” ’ Hopkins v. State, 661 So.2d 774, 779 (Ala.Crim.App.1994) (quoting 1 LaFave § 3.2(b), in turn quoting United States ex rel. Senk v. Brierley, 381 F.Supp. 447 (M.D.Pa.1974), aff'd, 511 F.2d 1396 (3d Cir.), cert. denied, 423 U.S. 843, 96 S.Ct. 77, 46 L.Ed.2d 63 (1975)). ‘[W]hen considering whether an arrest is valid, a police officer’s subjective intent is immaterial; the only requisite is that at the time the arrest is made, the police have probable cause.’ Carruth v. Barker, 454 So.2d 539, 540 (Ala.1984).”
Whitt v. State, 733 So.2d 463, 480 (Ala.Crim.App.1998). As this Court explained in Hamm v. State, 564 So.2d 453 (Ala.Crim.App.1989), aff'd, 564 So.2d 469 (Ala.1990):
“ ‘ “When an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest.” United States v. Saunders, 476 F.2d 5, 7 (5th Cir.1973). See generally 2 W. LaFave, Search and Seizure § 5.1(e), at 416 n. 168 (2d ed.1987).
“ ‘ “[T]he existence vel non of ... a [constitutional] violation turns on an objective assessment of the officer’s actions in light of the facts and circumstances confronting him at the time. Subjective intent alone ... does not make otherwise lawful conduct illegal or unconstitutional....
[[Image here]]
“ ‘ “[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer’s action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.” Scott v. United States, 436 U.S. 128, 136 [98 S.Ct. 1717, 1722, 56 L.Ed.2d 168] (1978).’
“Powell v. State, 548 So.2d 590, 600 (Ala.Cr.App.1988).”
564 So.2d at 462.
We likewise find that exigent circumstances were present that justified the warrantless arrest in the motel room.
“In United States v. Standridge, 810 F.2d 1034, 1037 (11th Cir.1987), cert. denied, 481 U.S. 1072, 107 S.Ct. 2468, 95 L.Ed.2d 877 (1987), the Eleventh Circuit Court of Appeals noted:
“ ‘Exigent circumstances do not necessarily involve “hot pursuit” of a fleeing criminal. Factors which indicate exigent circumstances include: (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) a reasonable belief that the suspect is armed; (3) probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that delay could cause the escape of the suspect or the destruction of *162 essential evidence, or jeopardize the safety of officers or the public. See Dorman v. United States, 435 F.2d 385, 392-93 (D.C.Cir.1970) (en banc); United States v. Campbell, 581 F.2d 22, 25-27 (2d Cir.1978); United States v. Newbern, 731 F.2d 744, 748-49 (11th Cir.1984); United States v. Roper, 681 F.2d 1354, 1357 n. 1 (11th Cir.1982) (dictum), cert. denied sub nom. Newton v. United States, 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983).’
“See, also, United States v. Kimmons, 965 F.2d 1001 (11th Cir.1992), cert. denied, 506 U.S. 1086, 113 S.Ct. 1065, 122 L.Ed.2d 370 (1993); and Bush v. State, 523 So.2d 538 (Ala.Crim.App.1988), and the authorities cited therein.”
Ex parte Rieber, 663 So.2d 999, 1002 (Ala.1995).
Here, every factor indicating exigent circumstances is present. Washington was a suspect in a brutal double homicide; no murder weapon had been found at the murder scene and thus it was reasonable to believe that Washington was armed; there was probable cause to believe that Washington had committed the murders; law-enforcement officers knew that Mr. McKinnon had loaned Washington the McKinnons’s Jetta, which was parked in the motel parking lot and knew that Washington had rented a room at the motel, thus providing strong reason to believe that Washington was in the motel room; and, given Washington’s disappearance and the reasonable belief that he could still be armed after the murders, there was a likelihood that delay could cause Washington to flee and/or to destroy essential evidence linking him to the murders, or that the safety of the officers and/or the public would be jeopardized.
Because there was both probable cause and exigent circumstances, Washington’s arrest was lawful, and neither the evidence obtained after the arrest nor his statement to law enforcement was fruit of the poisonous tree.[8] Therefore, the trial court properly denied Washington’s motions to suppress on this ground.
B.
Washington also contends that the trial court erred in denying his motions to suppress the evidence discovered during the search of his motel room and the Jetta because, he says, the State failed to prove that he voluntarily consented to the searches.
At the suppression hearing, David Watson, a sergeant with the ABI, testified that he arrived at John’s Motel shortly after Washington had been arrested. When he arrived, Sgt. Watson said, Washington was sitting in the back of a patrol car, handcuffed, wearing only his underwear. After learning of the circumstances surrounding Washington’s arrest from other officers at the scene, Sgt. Watson advised Washington of his Miranda[9] rights, and Washington signed a waiver-of-rights form. Sgt. Watson testified that Washington indicated that he understood each of his rights; that Washington put his initials by each right listed on the form; and that Washington did not appear to be under the influence of drugs or alcohol when he waived his rights. Sgt. Watson further testified that he did not threaten Washington or promise Washington anything in order to get *163 Washington to sign the waiver-of-rights form. After Washington signed the waiver-of-rights form, Sgt. Watson asked Washington for consent to search the motel room and the Jetta, and he presented Washington with a consent-to-search form. The preprinted form advised Washington that he could refuse permission for the search and included a statement that Washington had not been threatened or intimidated nor promised anything. On the form, Sgt. Watson handwrote that the search was for “money, weapons, drugs, any an all evidence pertaining to a murder in Millbrook, Alabama.” (C. 126.) Sgt. Watson testified that he read the entire form to Washington, including the handwritten additions; that Washington indicated that he understood the form; and that he did not threaten Washington or promise Washington anything in order to get Washington to sign the form. After Washington signed the consent-to-search form, Sgt. Watson said, the motel room was searched, and clothes from the motel room were given to Washington to wear. The Jetta was then impounded and searched later that evening.
Washington testified at the suppression hearing that it was cold and raining on the day of his arrest, and that he sat in an unheated patrol car wearing only his underwear “for a long time” before anyone spoke with him. (R. 104.) He said that two ABI officers got in the patrol car with him and told him that he could not get any clothes out of the motel room to wear until he “sign[ed] papers.” (R. 104.) According to Washington, he could not read the papers he signed;[10] he was never advised what the papers were; he was never told that the officers were investigating a murder; and he did not know that the papers he signed included a consent-to-search form.
Initially, we point out that the State argues, for the first time on appeal, that Washington lacked standing to challenge the search of the Jetta. However, the State did not present this argument to the trial court; the prosecutor did not argue a lack of standing at the suppression hearing or at any other time during the trial. Therefore, the State’s argument is deemed to be waived. See, e.g., Snavely v. City of Huntsville, 785 So.2d 1162 (Ala.Crim.App.2000); State v. Compton, 711 So.2d 1114 (Ala.Crim.App.1997); State v. Ivey, 709 So.2d 502 (Ala.Crim.App.1997); and Drake v. State, 668 So.2d 877 (Ala.Crim.App.1995). For purposes of this appeal, we assume that Washington has standing to challenge the search of the Jetta.
“This court has long held that warrantless searches are per se unreasonable, unless they fall within one of the recognized exceptions to the warrant requirement.” Rokitski v. State, 715 So.2d 859, 861 (Ala.Crim.App.1997). “One of the exceptions to the rule that a warrantless search is per se unreasonable is a search conducted with the consent of the owner.” Foldi v. State, 861 So.2d 414, 422 (Ala.Crim.App.2002). “Consent to a search must be knowingly, intelligently, and freely given.” Ex parte Wilson, 571 So.2d 1251, 1255 (Ala.1990). “ ‘[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority.’ ” Miller v. State, 602 So.2d 488, 491 (Ala. *164 Crim.App.1992), quoting Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). “[T]he question whether a consent to a search was in fact ‘voluntary’ or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances.” Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). “Factors relevant to this determination include the circumstances under which the defendant came into custody, the defendant’s awareness of the right to withhold consent, the defendant’s performance of cooperative acts, the defendant’s age, intelligence, and education, and the nature of police behavior.” Cable v. State, 540 So.2d 769, 774 (Ala.Crim.App.1985).
“No particular factor should be given undue weight in determining the issue of voluntariness. The fact that a defendant was not informed of the right to refuse to consent does not, of itself, negate a finding of voluntariness. Nor does the fact that the defendant was in police custody or that the officers made a showing of force. Kennedy v. State, 640 So.2d 22, 24-5 (Ala.Cr.App.1993), quoting Martinez v. State, 624 So.2d 711, 715-16 (Ala.Cr.App.1993).”
Rokitski, 715 So.2d at 861-62. See also United States v. Watson, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (“[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search. Similarly, under Schneckloth [v. Bustamonte, 412 U.S. 218, 234 (1973)], the absence of proof that [a defendant] knew he could withhold his consent, though it may be a factor in the overall judgment, is not to be given controlling significance.”). “However, although not dispositive of the question of voluntariness, the fact that a defendant had been advised of his Miranda rights and of his right to refuse the request to search are significant factors in determining whether the consent was voluntary.” Foldi, 861 So.2d at 422. See also United States v. Mendenhall, 446 U.S. 544, 558-59, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (“Although the Constitution does not require ‘proof of knowledge of a right to refuse as the sine qua non of an effective consent to a search,’ [Schneckloth v. Bustamonte, 412 U.S. 218, 234 (1973)] (footnote omitted), such knowledge was highly relevant to the determination that there had been consent.”).
Washington was 54 years old at the time of his arrest; testimony indicated that Washington was not under the influence of drugs or alcohol; and, although he had only a seventh-grade education, there is no indication that Washington was incapable of giving a knowing consent. Sgt. Watson testified that he advised Washington of his Miranda rights before he sought Washington’s consent to search; that Washington indicated that he understood those rights; and that Washington signed a waiver-of-rights form. Sgt. Watson further testified that he read the eonsent-to-search form to Washington, which included the fact that Washington had the right to refuse consent to search and that the search was for, among other things, evidence linking Washington to the murders, and that Washington, before signing the form, indicated that he understood the nature and contents of the form. Although Washington testified that he was told that he could not get clothes without first signing “papers,” Sgt. Watson testified that he did not threaten Washington or promise Washington anything for signing the consent-to-search form. Moreover, although Washington was clearly in custody at the time he gave consent — he had been arrested, handcuffed, and placed in the backseat of a patrol vehicle while clothed only in his underwear — and physical force had been *165 employed to effectuate that custody, that alone is not dispositive of the voluntariness of the consent. As noted in Part I.A. of this opinion, Washington’s arrest was lawful and, under the circumstances in this case, the fact that physical force was employed and Washington was in custody at the time he gave his consent does not, alone, overcome the other indications of voluntariness.
Considering the totality of the circumstances and resolving all credibility choices in favor of the trial court’s ruling, we conclude that Washington voluntarily consented to the search of the motel room and the Jetta. Therefore, the trial court properly denied Washington’s motions to suppress on this ground.
C.
Washington further contends that the trial court erred in denying his motion to suppress the shirt he was wearing at the time he gave his statement and all results from DNA testing on that shirt because, he says, the affidavit submitted in support of the search warrant was defective.
As noted above, when Washington was arrested at John’s motel, he was wearing only his underwear. After obtaining Washington’s consent to search the motel room, clothing was removed from the room and was given to Washington to wear. Washington was then transported to ABI headquarters, where he gave a statement to law-enforcement officers. After his statement, a search warrant was obtained to search Washington’s person and the clothing he was wearing. Washington was transported to the Montgomery County jail, at which point the clothing he was wearing was seized and fingernail clippings were taken. Subsequent testing of the shirt seized from Washington revealed the DNA of both Mr. McKinnon and Mrs. McKinnon, and the shirt, as well as the results of the DNA testing, was introduced by the State at trial.[11]
Washington makes several arguments regarding the validity of the affidavit submitted in support of the search warrant. However, because we conclude, as explained below, that no search warrant was necessary for the seizure and subsequent testing of Washington’s clothing, any defects in the affidavit would not affect the admissibility of the evidence. Thus, it is unnecessary for us to address Washington’s specific arguments.
In United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), the defendant was lawfully arrested for attempting to break into a post office and was transported to a local jail and placed in a cell. While investigating the crime, law-enforcement officers learned that the attempted entry into the post office had been made through a wooden window, and paint chips from the window were found on the sill. The next morning, approximately 10 hours after the defendant’s arrest, law-enforcement officers, after purchasing new clothing for the defendant, went to the jail and, without a warrant, seized the clothing the defendant had been wearing when he was arrested. Paint chips matching those found at the crime were found on the clothing. In holding that the seizure of the defendant’s clothing did not violate the Fourth Amendment, the United States Supreme Court stated:
“The prevailing rule under the Fourth Amendment that searches and seizures may not be made without a warrant is subject to various exceptions. One of *166 them permits warrantless searches incident to custodial arrests, United States v. Robinson, 414 U.S. 218 (1973); Chimel v. California, 395 U.S. 752, 755 (1969); Weeks v. United States, 232 U.S. 383, 392 (1914), and has traditionally been justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained. United States v. Robinson, supra.
“It is also plain that searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention. If need be, Abel v. United States, 362 U.S. 217 (1960), settled this question. There the defendant was arrested at his hotel, but the belongings taken with him to the place of detention were searched there. In sustaining the search, the Court noted that a valid search of the property could have been made at the place of arrest and perceived little difference
“ ‘when the accused decides to take the property with him, for the search of it to occur instead at the first place of detention when the accused arrives there, especially as the search of property carried by an accused to the place of detention has additional justifications, similar to those which justify a search of the person of one who is arrested,’ Id., at 239.
“The courts of appeals have followed this same rule, holding that both the person and the property in his immediate possession may be searched at the station house after the arrest has occurred at another place and if evidence of crime is discovered, it may be seized and admitted in evidence. Nor is there any doubt that clothing or other belongings may be seized upon arrival of the accused at the place of detention and ■later subjected to laboratory analysis or that the test results are admissible at trial.
“Conceding all this, the Court of Appeals in this case nevertheless held that a warrant is required where the search occurs after the administrative mechanics of arrest have been completed and the prisoner is incarcerated. But even on these terms, it seems to us that the normal processes incident to arrest and custody had not been completed when Edwards was placed in his cell on the night of May 31. With or without probable cause, the authorities were entitled at that point not only to search Edwards’ clothing but also to take it from him and keep it in official custody. There was testimony that this was the standard practice in this city. The police were also entitled to take from Edwards any evidence of the crime in his immediate possession, including his clothing. And the Court of Appeals acknowledged that contemporaneously with or shortly after the time Edwards went to his cell, the police had probable cause to believe that the articles of clothing he wore were themselves material evidence of the crime for which he had been arrested. 474 F.2d, at 1210. But it was late at night; no substitute clothing was then available for Edwards to wear, and it would certainly have been unreasonable for the police to have stripped respondent of his clothing and left him exposed in his cell throughout the night. Cf. United States v. Caruso, 358 F.2d 184, 185-186(CA2), cert. denied, 385 U.S. 862 (1966). When the substitutes were purchased the next morning, the clothing he had been wearing at the time of arrest was taken from him and subjected to laboratory analysis. This was no more than taking from respondent the effects in his immediate *167 possession that constituted evidence of crime. This was and is a normal incident of a custodial arrest, and reasonable delay in effectuating it does not change the fact that Edwards was no more imposed upon than he could have been at the time and place of the arrest or immediately upon arrival at the place of detention. The police did no more on June 1 than they were entitled to do incident to the usual custodial arrest and incarceration.
“Other closely related considerations sustain the examination of the clothing in this case. It must be remembered that on both May 31 and June 1 the police had lawful custody of Edwards and necessarily of the clothing he wore. When it became apparent that the articles of clothing were evidence of the crime for which Edwards was being held, the police were entitled to take, examine, and preserve them for use as evidence, just as they are normally permitted to seize evidence of crime when it is lawfully encountered. Chimel v. California, 395 U.S. 752 (1969); Frazier v. Cupp, 394 U.S. 731 (1969); Warden v. Hayden, 387 U.S. 294 (1967); Ker v. California, 374 U.S. 23 (1963) (plurality opinion); Zap v. United States, 328 U.S. 624 (1946), vacated on other grounds, 330 U.S. 800 (1947). Surely, the clothes could have been brushed down and vacuumed while Edwards had them on in the cell, and it was similarly reasonable to take and examine them as the police did, particularly in view of the existence of probable cause linking the clothes to the crime. Indeed, it is difficult to perceive what is unreasonable about the police’s examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest.
“... United States v. Caruso, supra, expresses similar views. There, defendant’s clothes were not taken until six hours after his arrival at a place of detention. The Court of Appeals properly held that no warrant was required:
“ ‘He and his clothes were constantly in custody from the moment of his arrest, and the inspection of his clothes and the holding of them for use in evidence were, under the circumstances, reasonable and proper.’ 358 F.2d, at 185 (citations omitted).
“Caruso is typical of most cases in the courts of appeals that have long since concluded that once the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other. This is true where the clothing or effects are immediately seized upon arrival at the jail, held under the defendant’s name in the ‘property room’ of the jail, and at a later time searched and taken for use at the subsequent criminal trial. The result is the same where the property is not physically taken from the defendant until sometime after his incarceration.
“In upholding this search and seizure, we do not conclude that the Warrant Clause of the Fourth Amendment is never applicable to postarrest seizures of the effects of an arrestee. But we do think that the Court of Appeals for the First Circuit captured the essence of situations like this when it said in United States v. DeLeo, 422 F.2d 487, 493 (1970) (footnote omitted):
“ ‘While the legal arrest of a person should not destroy the privacy of his *168 premises, it does — for at least a reasonable time and to a reasonable extent — take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence.’ ”
415 U.S. at 802-09, 94 S.Ct. 1234 (footnotes omitted).[12] See also United States v. Robinson, 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (“A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and ... in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a ‘reasonable’ search under that Amendment.”).
Similarly, in Powell v. State, 796 So.2d 404 (Ala.Crim.App.1999), aff'd, 796 So.2d 434 (Ala.2001), this Court upheld the war-rantless seizure of the clothing the defendant was wearing at the time of his arrest, stating:
“A police officer may search for and seize any evidence on the arrestee’s person, even if the evidence is unrelated to the crime for which the arrest was made, in order to prevent concealment or destruction of evidence. See Thomas v. State, 666 So.2d 849, 853-54 (Ala.Cr.App.1993), rev’d on other grounds, 666 So.2d 855 (Ala.1995) (cocaine discovered in defendant’s pockets after an arrest for disorderly conduct was admissible at trial where defendant was charged with disorderly conduct and possession of cocaine); Ex parte Scarbrough, 621 So.2d [1006,] at 1010 [(Ala.1993)] (confession to a murder, obtained while defendant was under arrest for traffic violation, was admissible at trial); Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Moreover, a search incident to a lawful arrest does not have to be made immediately on arrest. ‘[S]earches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention.’ United States v. Edwards, 415 U.S. 800, 803, 94 S.Ct. 1234, 1237, 39 L.Ed.2d 771 (1974). See also Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).
“Having determined that Powell’s arrest for disorderly conduct was lawful, the subsequent search of his person and seizure of his clothes incident to that lawful arrest was permissible. See Taylor v. State, 239 Ga.App. 858, 522 S.E.2d 266 (1999); State v. Staten, 238 Neb. 13, 469 N.W.2d 112 (1991); Pinkston v. State, 189 Ga.App. 851, 377 S.E.2d 864 (1989); and 2 LaFave, Search and Seizure § 5.3 (3d ed.1996). Therefore, the trial court did not err in denying Powell’s motion to suppress these items.” *169 796 So.2d at 425-26. See also Ex parte Hilley, 484 So.2d 485 (Ala.1985); Peoples v. State, 510 So.2d 554 (Ala.Crim.App.1986), aff'd, 510 So.2d 574 (Ala.1987); and Burkett v. State, 439 So.2d 737 (Ala.Crim.App.1983).
As explained in Part I.A. of this opinion, Washington was lawfully arrested based on probable cause and exigent circumstances. At the time his clothing was seized, law-enforcement officers had reason to believe it contained evidence linking him to the murders. The brutality of the murders and the blood spatter found at the crime scene indicated that the perpetrator would have blood evidence on his person and/or clothing, and testimony was presented that there were noticeable spots on Washington’s clothing. Of course, we recognize that Washington was not wearing, at the time of his arrest, the clothing that was seized; rather, that clothing was taken from the motel room by law-enforcement officers and given to him after his arrest. However, as in Edwards, where the United States Supreme Court found that it would have been unreasonable to take the defendant’s clothing and leave him in his jail cell unclothed overnight, it likewise would have been unreasonable in this case for law-enforcement officers to transport Washington to ABI headquarters and then to the Montgomery County jail clothed only in his underwear.[13] The only reasonable course of action was to provide Washington with clothing from the motel room until such time as other clothing could be procured, specifically, the jail clothing provided when Washington arrived at the Montgomery County jail.
Because Washington’s arrest was lawful, the seizure and subsequent testing of Washington’s clothing was proper incident to his arrest, even without a warrant. Thus, even assuming the affidavit submitted in support of the search warrant was defective, as Washington argues,[14] its defectiveness would not have affected the admissibility of the shirt or the results from the DNA testing on the shirt. Accordingly, the trial court properly denied Washington’s motion to suppress on this ground.[15]
D.
Last, Washington contends that the trial court erred in not suppressing the hair sample obtained pursuant to the seizure order and all results from testing on the hair, as well as all results from DNA testing on the saliva sample obtained pursuant to the seizure order. Specifically, Washington argues that the affidavit submitted in support of the seizure order (1) did not include the fact that some of the information contained in the affidavit had been obtained from other law-enforcement officers and was not within the personal knowledge of the affiant; (2) included as part of the basis for probable cause the evidence obtained from the search of the motel room, the Jetta, and his clothing which, he says, was obtained in violation of his constitutional rights; and (3) omitted the fact that the McKinnons’ Jetta had been loaned to him. Because of these alleged defects in the affidavit, Washington concludes, the seizure order was void and *170 all evidence obtained pursuant to that order should have been suppressed.
Lynn Rhodes, a corporal with the ABI and the agent in charge of investigating the McKinnons’ murders, obtained the seizure order on February 6, 2008, by submitting the following affidavit:
“My name is Lynn L. Rhodes. I am employed with the Alabama Bureau of Investigation. I have been employed in law enforcement for the past fourteen years. I have investigated numerous murder cases. I have attended numerous homicide schools and received specialized training in homicide investigation.
“Affiant states she has reason to believe, probable cause to believe and clear indication to believe that a saliva and hair sample taken from the person of Charles Washington ... and analysis thereof will provide DNA evidence and hair comparisons linking Charlie Washington to the murders of Julian and Florence McKinnon.
“The facts tending to establish the foregoing grounds for this issuance of a seizure order are as follows:
“On Wednesday, January 22, 2003, the Millbrook Police Department responded to the residence of Julian and Florence McKinnon. Said residence is located at 2810 Tanglewood Drive in Millbrook, El-more County, Alabama. Upon arriving, it was discovered the residence had been burglarized and Julian and Florence McKinnon were found beaten to death.
“Based on my investigation, I determined that said decedents owned one 1991 Volkswagen Jetta which was missing from the residence. Said vehicle was located on Wednesday, January 22, 2003, at John’s Motel in Montgomery, Alabama. Upon check of the motel residents it was determined that Charlie Washington was residing in room #118 of said Motel. Pursuant to a consent search of Charlie Washington’s room approximately one thousand dollars in lawful United States currency was located. Furthermore, a search of the 1991 Volkswagen Jetta revealed more than six thousand dollars in United States currency.
“Your affiant has learned Charlie Washington was a ‘handyman’ for Julian and Florence McKinnon where he had worked part time for the past three years. On Monday, January 20, 2003, Charlie Washington accompanied Julian McKinnon to Clio, Alabama where Julian McKinnon was given $10,000.00 (ten thousand dollars) United States currency during a business transaction with Joe Carpenter. The investigation has revealed the currency was transported and stored at the Tanglewood Drive residence by Julian McKinnon. During the course of this investigation, law enforcement officers discovered the $10,000.00 (ten thousand dollars) U.S. currency was missing from the McKinnon residence.
“On January 22, 2003, a search warrant was executed on the person of Charlie Washington. Several items of clothing were taken at this time. These clothes were submitted to the Department of Forensic Sciences for analysis. On January 23, 2003,1 received information from the Alabama Department of Forensic Sciences that human blood had been located on the pants of the submitted clothing seized from Charlie Washington.
“On January 23, 2003, I was present when Department of Forensic Sciences Pathologist, Doctor Emily Ward, performed an autopsy on Julian and Florence McKinnon. Dr. Ward located a foreign course hair in the left hand of Julian McKinnon.
*171 “Affiant shows that based on the above and foregoing facts and information, Affiant has probable cause to believe and clear indication to believe that evidence relating to Charlie Washington’s involvement in the murders of Julian and Florence McKinnon will be found in hair comparison analysis and in DNA evidence obtained from Charlie Washington.”
(C. 132-34.)
We first reject Washington’s argument that the affidavit did not indicate that some of the information was obtained from other law-enforcement officers. It is well settled that “[p]robable cause may be based on hearsay from a reliable source if there is a disclosed, reliable basis for the information,” Marks v. State, 575 So.2d 611, 615 (Ala.Crim.App.1990), and that “[ojbservations of fellow officers participating in the same investigation are entitled to a presumption of reliability and would provide probable cause upon which to base the issuance of a search warrant applied for by one of the investigating officers.” Hallford v. State, 548 So.2d 526, 533 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.1989). See United States v. Ventresca, 380 U.S. 102, 111, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) (“Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number.”). When information from other law-enforcement officers is relied on in an affidavit to establish probable cause for the issuance of a warrant, it must be clear from the affidavit that the affiant is relying on information from other law-enforcement officers and not on his or her own personal knowledge. See, e.g., State v. Odom, 872 So.2d 887 (Ala.Crim.App.2003), and Moore v. State, 570 So.2d 788 (Ala.Crim.App.1990). As this Court explained in Villemez v. State, 555 So.2d 342 (Ala.Crim.App.1989):
“ ‘Officers operating in the field are entitled to rely on the information and judgment of fellow officers with whom they are working in close concert. [United States v. Bernard, 607 F.2d 1257, 1266-67 (9th Cir.1979)]. The situation is very different when an application is made for a warrant. Unlike officers in the field, a magistrate is not entitled to rely on the judgment of law enforcement officials. He or she is expected to review the material submitted and make a detached, independent judgment as to the existence of probable cause. [Citations omitted.]’
“United States v. Davis, 714 F.2d 896, 900 (9th Cir.1983).
“‘[A] magistrate must be presented with facts as to the source of the information in the affidavit and the underlying circumstances from which it could be concluded that the source was reliable. [Citations omitted.]....
“ ‘ “Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their numbers.” [Citations omitted.] To comply with the requirement of particularity and to enable the magistrate to make an independent probable cause evaluation, however, the agent must state in the affidavit that he is relying upon other officers. [Citations omitted.] We caution that this requirement should not be viewed “in a hypertechnical, rather than a common-sense, manner.” [Citation omitted.] It is sufficient if the affidavit recites at the outset, or if it is clear from reading the affidavit as a whole, that it is based in part upon informa *172 tion obtained from other law enforcement officers.’ [Citations omitted.]
“[United States v.] Kirk, 781 F.2d [1498,] 1504-05 [ (11th Cir.1986) ].”
555 So.2d at 343-44.
In the affidavit, Cpl. Rhodes specifically referred to the Millbrook Police Department and to “law enforcement officers.” When referring to her own personal knowledge, Cpl. Rhodes referred to herself in the first person, stating “I determined,” “[b]ased on my investigation,” “affiant has learned” or “I received information.” The remainder of the affidavit included phrases such as “it was determined” or “the investigation has revealed.” Recognizing that affidavits “are normally drafted by nonlawyers in the midst and haste of a criminal investigation” and reading the affidavit as a whole in a “commonsense and realistic fashion,” Ventresca, 380 U.S. at 108, 85 S.Ct. 741, it is clear that some information contained in the affidavit was within Cpl. Rhodes’s personal knowledge and that some information contained in the affidavit had been obtained from other law-enforcement officers. Thus, the affidavit was not defective on this ground.
We likewise reject Washington’s argument that the affidavit improperly included evidence obtained from the search of the motel room, the Jetta, and his clothing. “ ‘[E]vidence which is obtained as a direct result of an illegal search and seizure may not be used to establish probable cause for a subsequent search.’ ” Wyley v. State, 565 So.2d 1200, 1201 (Ala.Crim.App.1990), quoting United States v. Wanless, 882 F.2d 1459, 1465 (9th Cir.1989). See also United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), and Maddox v. State, 502 So.2d 779 (Ala.Crim.App.1985), aff'd in pertinent part, remanded on other grounds, 502 So.2d 786 (Ala.1986). However, because we have already determined that all of this evidence was properly seized, see Parts I.A., I.B. and I.C. of this opinion, inclusion of this information in the affidavit was proper.
Finally, Cpl. Rhodes’s omission from the affidavit of the fact that the McKinnons’ Jetta was missing from the residence the day their bodies were discovered because Mr. McKinnon had loaned the car to Washington does not render the affidavit defective. In Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the United States Supreme Court recognized a limited right to challenge the veracity of an affidavit submitted in support of a warrant; the Court held that
“where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant’s request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit’s false material set to one side, the affidavit’s remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.”
438 U.S. at 155-56, 98 S.Ct. 2674. The holding in Franks has been interpreted to include not only false statements in an affidavit, but also material omissions from an affidavit. See Wyley; Williams v. State, 440 So.2d 1139 (Ala.Crim.App.1983); and 2 W. Lafave, Search and Seizure, *173 § 4.4(b) (3d ed.1996), and the cases cited therein.
Here, Washington failed to prove by a preponderance of the evidence that the omission by Cpl. Rhodes was intentional or that it was done with reckless disregard for the truth. In United States v. Colkley, 899 F.2d 297 (4th Cir.1990), the United States Court of Appeals for the Fourth Circuit upheld an affidavit submitted in support of an arrest warrant that omitted the fact that numerous witnesses had failed to identify the defendant in a photographic lineup. In doing so, the Court held that, in the context of omissions, the Franks requirement that the falsity be made intentionally or with reckless disregard for the truth requires more than the mere fact of omission; the Court explained:
“Affidavits ‘are normally drafted by non-lawyers in the midst and haste of a criminal investigation.’ United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation. However, every decision not to include certain information in the affidavit is ‘intentional’ insofar as it is made knowingly. If, as the district court held, this type of ‘intentional’ omission is all that Franks[ v. Delaware, 438 U.S. 154 (1978),] requires, the Franks intent prerequisite would be satisfied in almost every case.
“Franks clearly requires defendants to allege more than ‘intentional’ omission in this weak sense. ‘The mere fact that the affiant did not list every conceivable conclusion does not taint the validity of the affidavit.’ United States v. Burnes, 816 F.2d 1354, 1358 (9th Cir.1987). Franks protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate. See [United States v.] Reivich, 793 F.2d [957,] 961 [ (8th Cir.1986) ]. To obtain a Franks hearing the defendant must show that the omission is the product of a ‘deliberate falsehood or of reckless disregard for the truth.’ Franks, 438 U.S. at 171, 98 S.Ct. at 2684. ‘[M]ere[] negligen[ce] in ... recording the facts relevant to a probable-cause determination’ is not enough. Id. at 170, 98 S.Ct. at 2683.
“This case presents a question of omission rather than commission on the part of the agent. While omissions may not be per se immune from inquiry, see United States v. Owens, 882 F.2d 1493, 1498-99 (10th Cir.1989); Reivich, 793 F.2d at 961, the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory. This latter situation potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant’s benefit. The potential for endless rounds of Franks hearings to contest facially sufficient warrants is readily apparent.
“Here [the defendant] made no showing, and the district court possessed no evidence, that agent Moore had the requisite intent to mislead. The most that the record here reveals about Moore’s failure to include the photospread information is that he did not believe it to be relevant to the probable cause determination. At the very worst, he was merely negligent in disclosing all relevant considerations to the magistrate. His acts fell far short of the level of flagrant police action Franks is designed to pre *174 vent, and a hearing under that decision was not required.”
899 F.2d at 300-01. Washington failed to prove that, in omitting the fact that the Jetta had been loaned to Washington, Cpl. Rhodes intended to mislead the magistrate or acted with reckless disregard of the possibility that the omission would mislead the magistrate. To the contrary, Cpl. Rhodes testified at the suppression hearing that she omitted the fact that the Jetta had been loaned to Washington because at the time she submitted the affidavit she knew only that the car had been loaned to Washington on Monday, January 20, and did not know for how long the car had been loaned, i.e., whether on Wednesday, January 22, when the car was discovered, Washington was still in rightful possession of it. Thus, it is clear that Cpl. Rhodes’s omission was not made with the intent to mislead the magistrate or with reckless disregard for the possibility that the omission could mislead the magistrate; rather, Cpl. Rhodes omitted the fact that the car had been loaned to Washington to avoid misleading the magistrate.
Furthermore, even if we were to conclude that Cpl. Rhodes’s omission was intentional or reckless (which we do not), the omission was hot material under Franks and, thus, would not render the seizure order void. “‘The omission of facts rises to the level of misrepresentation only if the omitted facts “cast doubt on the existence of probable cause.”’” Wyley, 565 So.2d at 1202, quoting United States v. Ellison, 793 F.2d 942, 947 (8th Cir.1986), quoting in turn United States v. Dennis, 625 F.2d 782, 791 (8th Cir.1980). “Insignificant and immaterial misrepresentations or omissions will not invalidate a warrant.” United States v. Ofshe, 817 F.2d 1508, 1513 (11th Cir.1987).
“[T]o be material under Franks, an omission must do more than potentially affect the probable cause determination: it must be ‘necessary to the finding of probable cause.’ Franks, 438 U.S. at 156, 98 S.Ct. at 2676. For an omission to serve as the basis for a hearing under Franks, it must be such that its inclusion in the affidavit would defeat probable cause for arrest. See Reivich, 793 F.2d at 961. Omitted information that is potentially relevant but not dispositive is not enough to warrant a Franks hearing. Id. at 962.”
United States v. Colkley, 899 F.2d at 301. In determining whether a statement or omission is material, the affidavit must be corrected, i.e., the false statements removed or the omissions added, and then reviewed to determine whether the affidavit, as corrected, was sufficient to establish probable cause. See, e.g., Franks v. Delaware; Sims v. State, 587 So.2d 1271 (Ala.Crim.App.1991); Wyley; Madiwale v. Savaiko, 117 F.3d 1321 (11th Cir.1997); and 2 W. Lafave, Search and Seizure, § 4.4(c) (3d ed.1996). In this case, the addition of the fact that the Jetta had been loaned to Washington would not have defeated probable cause. Even with the inclusion of that fact, the affidavit was more than sufficient to establish probable cause for the seizure order. The affidavit included the information law enforcement had leading up to Washington’s arrest, the evidence discovered in the motel room and the Jetta linking Washington to the murder, and the fact that a preliminary test on Washington’s clothing revealed the presence of human blood.
Washington failed to prove that the omission from the affidavit of the fact that the Jetta had been loaned to Washington was intentional or reckless, and the omission was not material to the finding of probable cause; thus, the affidavit was not defective in this regard.
*175 For the reasons stated above, the affidavit submitted in support of the seizure order was not defective; thus, the seizure order was valid. The trial court properly denied Washington’s motion to suppress on this ground.
II.
Washington contends that the trial court erred in granting the State’s challenge for cause as to prospective juror M.J. on the ground that she was opposed to the death penalty because, he says, M.J.’s responses during voir dire examination do “not clearly show that she would have voted against the death penalty regardless of the evidence.” (Issue VIII in Washington’s brief at p. 71.) We disagree.
On the juror questionnaire, M.J. responded affirmatively to question number 41 — “Do you have any ethical, religious, political, or other beliefs that may prevent you from serving as a juror” — and wrote, “I don’t believe in the death penalty.” During general voir dire of the entire venire by the trial court, M.J. responded affirmatively to the court’s question whether anyone possessed a personal or religious belief against the death penalty. During individual voir dire examination of M.J., the following then occurred:
“THE COURT: ... This is juror number 134, [M.J.].
“[M.J.], there were several areas that you responded to.
“First area I asked whether there was any juror who had personal or religious beliefs against the death penalty or something close to that. And you responded to that question. Would you please tell us what your response is?
“[M.J.]: My — okay. Excuse me. I just don’t believe that anybody has a right to decide whether somebody else lives or dies in one case. In another case, depending on I would .say how much — you may be proven guilty and sentenced to die, you know, through no fault of your own.
“THE COURT: Would those beliefs put you in a position where you would be unable to follow the law and apply the law to the facts no matter what you found those facts to be?
“[M.J.]: Are you asking me would I be able to say somebody be sentenced to death?
“THE COURT: Yes.
“[M.J.]: Probably so.
“THE COURT: Run that by me again.
“[M.J.]: Yes, I would.
“THE COURT: If the facts and if the law met, you would be able to follow the law and vote for death. I’m talking about the death penalty now. I’m past the guilt stage. If the law and the facts justified it, would you be able to vote in favor of death? That’s my question.
“[M.J.]: No, sir, I wouldn’t.
“THE COURT: That’s what I needed to know. Thank you, [M.J.].”
(R. 233-34.)
“ ‘ “The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is ‘whether the juror’s views would “prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” ’ Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi 481 U.S. 648 [at 657-58], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). ‘The crucial inquiry is whether the veniremen could follow the court’s instructions and obey his oath, notwithstanding his views on capital *176 punishment.’ Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror’s bias need not be proved with ‘unmistakable clarity’ because ‘juror bias cannot be reduced to question and answer sessions which obtain results in the manner of a catechism.’ Id.
“ ‘ “A trial judge’s finding on whether or not a particular juror is biased ‘is based upon determination of demeanor and credibility that are peculiarly within a trial judge’s province.’ Witt, 469 U.S. at 428, 105 S.Ct. at 854. That finding must be accorded proper deference on appeal. Id. ‘A trial court’s ruling on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.’ Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981).”
“ ‘Martin v. State, 548 So.2d 488, 490-91 (Ala.Cr.App.1988), affirmed, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). “[A] blanket declaration of support of or opposition to the death penalty is not necessary for a trial judge[ ] to disqualify a juror.” Ex parte Whisenhant, 555 So.2d 235, 241 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990).’ ”
Dallas v. State, 711 So.2d 1101, 1107 (Ala.Crim.App.1997), aff'd, 711 So.2d 1114 (Ala.1998), quoting Taylor v. State, 666 So.2d 36, 47 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995).
Although M.J. initially indicated during individual voir dire that she could impose the death penalty, it appears that her response was based on a misunderstanding of the question. Once the question was clearly put to M.J., she stated unequivocally that she could not impose the death penalty under any circumstances. That response was consistent with her statement during general voir dire that she possessed a personal or religious belief against the death penalty and her answer on the juror questionnaire that she did not believe in the death penalty. We find no abuse of discretion on the part of the trial court in granting the State’s challenge for cause as to prospective juror M. J.
III.
Finally, Washington contends that the trial court erred in summarily denying his motion for a new trial without affording him an evidentiary hearing. In his motion for a new trial, Washington made only general and conclusory allegations. He alleged that “the verdict is contrary to law, the verdict is contrary to the weight of the evidence, and the defendant was denied a fair and impartial trial”; that “[t]he Court erred in sustaining objections to questions addressed to witnesses”; that “[t]he Court erred in admitting testimony of witnesses”; that “[t]he Court erred in admitting improperly and illegally obtained evidence”; and that “[t]he Court erred in charging the jury and in refusing to charge the jury as requested.” (C. 221.) The motion was neither verified nor supported by affidavits.
“ ‘A defendant is not entitled to a hearing on a motion for new trial without a special basis therefor.’ ” Clark v. State, 621 So.2d 309, 327 (Ala.Crim.App.1992), quoting Smelcher v. State, 520 So.2d 229, 232 (Ala.Crim.App.1987). See also Arrington v. State, 757 So.2d 484 (Ala.Crim.App.1999). “[B]are allegations that the trial court had erred” are not sufficient to warrant an evidentiary hearing on a motion for a new trial. Meeks v. State, 697 *177 So.2d 60, 61 (Ala.Crim.App.1996). Moreover, unless the grounds are sufficiently specific and supported by facts contained in the record, a motion for a new trial must be verified and supported by affidavit. See, e.g., Ex parte Jefferson, 749 So.2d 406 (Ala.1999); Jones v. State, 727 So.2d 866 (Ala.Crim.App.1998); and Hill v. State, 675 So.2d 484 (Ala.Crim.App.1995). “Assertions of counsel in an unverified motion for new trial are bare allegations and cannot be considered as evidence or proof of the facts alleged.” Smith v. State, 364 So.2d 1, 14 (Ala.Crim.App.1978). “ ‘Error may not be predicated upon the overruling of a motion for new trial where there was no evidence offered in support of the motion.’ ” Britain v. State, 518 So.2d 198, 203 (Ala.Crim.App.1987), quoting Tucker v. State, 454 So.2d 541, 547-48 (Ala.Crim.App.1983), rev’d on other grounds, 454 So.2d 552 (Ala.1984). See also Arnold v. State, 601 So.2d 145, 154 (Ala.Crim.App.1992) (“There is no error in a trial court’s denial of a motion for new trial where no evidence is offered in support of that motion.”).
Because Washington’s motion for a new trial was not verified, because no affidavits were submitted in support of the motion, and because the motion contained only general and conclusory allegations, Washington was not entitled to an evidentiary hearing on the motion. Therefore, the trial court did not err in summarily denying Washington’s motion for a new trial without conducting an evidentiary hearing.
TV.
In accordance with Rule 45A, Ala.R.App. P., we have examined the record for any plain error with respect to Washington’s capital-murder convictions, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings during the guilt phase of the trial.
We have also reviewed Washington’s sentence in accordance with § 13A-5-53, Ala.Code 1975, which requires that, in addition to reviewing the case for any error involving Washington’s capital-murder convictions, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court’s findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this Court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Washington of the capital offenses charged in the indictment, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala.Code 1975. After hearing evidence concerning the aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of *178 an advisory verdict, the jury recommended a sentence of death by a vote of 10-2.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence Washington to life imprisonment without the possibility of parole or to death as recommended by the jury. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b), Ala.Code 1975. In its sentencing order, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense and Washington’s participation in it.
In its findings, the trial court found the existence of the following statutory aggravating circumstances: (1) that the murders of Mr. and Mrs. McKinnon were committed during the course of a robbery, see § 13A-5-49(4), Ala.Code 1975; (2) that the murders of Mr. and Mrs. McKinnon were committed during the course of a burglary, see § 13A-6-49(4), Ala.Code 1975; and (3) that the murders of Mr. and Mrs. McKin-non were committed by one act or pursuant to one scheme or course of conduct, see § 13A-5-49(9), Ala.Code 1975. The trial court found the existence of one statutory mitigating circumstance: that Washington had no significant history of prior criminal activity. The trial court also heard testimony regarding Washington’s character and any of the circumstances of the offense that Washington offered as a basis for sentencing him to life imprisonment without parole instead of death, see § 13A-5-52, Ala.Code 1975. In this regard, the trial court found the following to constitute nonstatutory mitigation: Washington’s family history and his relationship with his family as evidenced through testimony of two of Washington’s siblings and information contained in the presentence investigation report.[16]
The trial court’s sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstances against the mitigating circumstances, the trial court found that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced Washington to death. The trial court’s findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence, and we find no plain error or defect in the penalty phase of the proceedings.
Washington was convicted of two counts of capital murder during a robbery, two counts of capital murder during a burglary, and one count of capital murder of two or more persons by one act or pursuant to one scheme or course of conduct. These offenses are defined by statute as capital offenses. See §§ 13A-5-40(a)(2), 13A-5-40(a)(4), and 13A-5-40(a)(10), Ala. Code 1975. We take judicial notice that *179 similar crimes have been punished capitally throughout the state. See, e.g., Eggers v. State, 914 So.2d 883 (Ala.Crim.App.2004), and the cases cited therein dealing with murders committed during a robbery; Hall v. State, 820 So.2d 113 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001), and cases cited therein dealing with murders committing during a burglary; and Miller v. State, 913 So.2d 1148, 1154 (Ala.Crim.App.2004) (opinion on return to remand), and the cases cited therein dealing with murders of two or more people by one act or pursuant to one scheme or course of conduct.
After carefully reviewing the record of the guilt phase and of the penalty phase of Washington’s trial, we find no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. The findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstances against the mitigating circumstances, and we concur in the trial court’s judgment that the aggravating circumstances outweigh the mitigating circumstances, and we agree that death is the appropriate sentence in this case. Considering the crime committed and Washington, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Washington’s capital-murder convictions and his sentence of death are affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.

. Apparently, the McKinnons often let Washington borrow the Jetta.

. Washington, was 54 years old at the time of the murders.

. The saliva sample itself was not introduced into evidence.

. Washington did not testify at trial.

. Washington does not dispute that the knowledge of the investigators at the murder scene was imputed to the Montgomery police officers who effectuated the arrest. " 'The knowledge of all the officers involved in a police situation may be evaluated collectively in assessing whether that knowledge constituted probable cause as is constitutionally required.' ” Kolonusz v. State, 552 So.2d 1075, 1077-78 (Ala.Crim.App.1989), quoting Shute v. State, 469 So.2d 670, 673 (Ala.Crim.App.1984). See also Freeman v. State, 586 So.2d 1013, 1016 (Ala.Crim.App.), on return to remand, 594 So.2d 1300 (Ala.Crim.App.1991) ("[T]he facts known to one officer are imputed to other officers working under the same authority.”); Parker v. State, 397 So.2d 199, 201 (Ala.Crim.App.1981) ("The knowledge possessed by a superior officer may be imputed to the individual arresting officer in determining whether probable cause existed for the arrest.”); and Robinson v. State, 361 So.2d 379, 382 (Ala.Crim.App.1978) ("The court may evaluate the knowledge of all officers collectively in assessing police justification for arrest.”).

. The record does not indicate whether the investigators knew at the time of the arrest that Washington had not been present when the money exchanged hands in Clio. Although Carpenter’s testimony at trial clearly shows that was the case, and the record affirmatively indicates that law-enforcement officers spoke with Carpenter at the murder scene, no testimony was presented regarding exactly what Carpenter told the officers at the murder scene. Whether Carpenter made this fact known to the officers at the murder scene or whether he first informed them of this fact several days later, on January 30, 2003, when he made a formal statement is not revealed in the record.

.Although Howard testified at trial that the McKinnons loaned Washington the Jetta on Monday, January 20, testimony from law-enforcement officers indicated that when they spoke with Howard at the murder scene on Wednesday, January 22, she was not clear as to exactly what day, Sunday or Monday, the McKinnons loaned the car to Washington. (R. 94.) Thus, at the time of Washington's arrest, law-enforcement officers knew only that the car had been loaned to Washington sometime earlier in the week.

. Although Washington’s only argument on appeal regarding his statement is that it was the fruit of the allegedly illegal arrest, we have reviewed the record and we conclude that Washington's statement was voluntary.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Although Washington did not testify why he could not read the papers, the record indicates that Washington did not have his eyeglasses at the time; they were provided to him later at ABI headquarters.

. No evidence relating to the fingernail clippings was introduced by either party at trial. The jeans and boots Washington was wearing, which did not contain the McKinnons' DNA, were introduced by the defense.

. The rule in Edwards that searches and seizures that could have been lawfully conducted contemporaneously with an arrest can also be lawfully conducted after a substantial period has elapsed has been limited to searches of the arrestee’s person and personal effects on the arrestee’s person or within the arrestee's immediate control, as was the case here, as opposed to searches of personal effects “not immediately associated with the person of the arrestee.” United States v. Chadwick, 433 U.S. 1, 15, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), overruled on other grounds, California v. Acevedo, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). For discussions of this limitation, see Preston v. State, 141 Md.App. 54, 784 A.2d 601 (2001), Curd v. City Court of Judsonia, Arkansas, 141 F.3d 839 (8th Cir.1998), and People v. Boff, 766 P.2d 646 (Colo.1988), and the cases cited therein.

. Of course, had law-enforcement officers taken that unreasonable course of action, the clothing would have been lawfully seized pursuant to the consensual search of the motel room.

. We express no opinion in this regard.

.If a trial court’s ruling on a motion to suppress is correct for any reason, it will be affirmed by this Court. See, e.g., Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App.1985), aff'd, 494 So.2d 772 (Ala.1986).

. We do not list all of the information presented in mitigation, we merely note that such information included, but was not limited to: (1) the fact that Washington's father died when he was three years old and he was raised by his mother who, at the time of trial, was elderly and in poor health; (2) Washington's close loving relationship with eight siblings, six children, and several grandchildren; (3) the fact that Washington dropped out of school in the seventh grade; and (4) Washington’s involvement with and use of crack cocaine around the time of the murders.